Volume 1 of 2

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MATTHEW LOREN COOK,
       *Petitioner-Appellant,*

v.

ANTHONY LAMARQUE,
       *Respondent-Appellee.*

No. 08-15894

D.C. No.
2:02-CV-02240-
LKK-GGH

OPINION

Appeal from the United States District Court
for the Eastern District of California
Lawrence K. Karlton, District Judge, Presiding

Argued and Submitted
May 4, 2009—San Francisco, California

Filed January 7, 2010

Before: Procter Hug, Jr., Michael Daly Hawkins, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Tallman;
Partial Concurrence and Partial Dissent by Judge Hawkins

## COUNSEL

Allison Claire (argued), Federal Public Defender's Office, Sacramento, California, for petitioner-appellant Matthew L. Cook.

Ward A. Campbell (argued), Eric L. Christoffersen, Office of the California Attorney General, Sacramento, California, for respondent-appellee Anthony LaMarque.

## OPINION

TALLMAN, Circuit Judge:

Matthew Cook was convicted by a Sacramento County, California, jury of murder, attempted murder, conspiracy to commit assault with a firearm, and burglary. In his petition for a writ of habeas corpus, he argues the prosecutor's use of peremptory challenges to strike African American jurors violated his rights under the Equal Protection Clause of the Fourteenth Amendment. He also alleges prejudice based on jury misconduct in violation of the Sixth Amendment. The district court denied the petition. We have jurisdiction under 28 U.S.C. §§ 1291 and 2253, and we affirm.

**I**

On October 16, 1995, Cook and three accomplices broke into the apartment of Jimmie Fonseca and Carl Kato. They had plotted revenge after Fonseca "pistol-whipped" Cook in an earlier incident, and for other offenses against Cook and his friends. Cook and his accomplices entered the apartment wearing ski masks and carrying handguns and shot Fonseca and Kato. Fonseca died and Kato was seriously wounded. Cook was charged on a four-count information and tried together with co-defendants Lozo and Gains.

The Sacramento County Superior Court jury pool consisted of 195 people. During the selection process, the assistant district attorney used twenty-five of his forty permitted peremptory challenges. Seven of these challenges struck African American prospective jurors: Watkins, Reynolds, Singleton, Parker, Tillman, Livingston-Blanks, and Maxey. Three African Americans remained and the prosecutor explicitly noted his preference that two of these people serve. The defense used peremptory challenges to strike these two. One African American was ultimately seated on the jury.

The defendants challenged the prosecutor's seven strikes against African Americans and moved for mistrial under *Batson v. Kentucky*, 476 U.S. 79 (1986), and its California analog, *People v. Wheeler*, 22 Cal. 3d 258 (1978). The trial judge held a hearing and discussed the factors bearing on his analysis, including the prosecutor's credibility. The judge concluded the prosecutor had "used reasonable, acceptable criteria. They are not pretext, and they are not systematic." The case proceeded to trial and Cook was convicted on all counts.

Cook raised his *Batson* challenge again on direct appeal. The California Court of Appeal considered the jurors individually. It noted the reasons given to justify each challenge, and concluded the given reasons were race-neutral, but did not

provide any discussion or reasoning for why it credited the prosecutor's justifications. It did not engage in comparative juror analysis because, at the time, California law prohibited an appellate court from performing such analysis for the first time on appeal. *See Ali v. Hickman*, 584 F.3d 1174, 1179 (9th Cir. 2009). The California Supreme Court denied review.

Cook filed a federal habeas petition and the matter was initially referred to a magistrate judge. The magistrate engaged in an extensive analysis, including comparative juror analysis. Though he considered the strikes against Jurors Parker, Tillman, and Watkins to be "close cases," he found no *Batson* violation and recommended denial of the petition. The district court adopted the magistrate's findings, but, drawing on precedent from other circuits, employed a mixed-motives approach to resolving the *Batson* claim. The district court concluded the prosecutor was motivated by both legitimate and illegitimate reasons in challenging Juror Watkins, and explicitly noted that without the mixed-motives analysis, it would have granted the petition. It concluded the other six strikes were valid even without mixed-motives analysis. Cook timely appeals.

## II

### A

A *Batson* challenge has three steps: first, "the defendant must make a prima facie showing that a challenge was based on race;" second, the prosecution must offer a race-neutral basis for the challenge; and third, the court must determine whether the defendant has shown "purposeful discrimination." *Ali*, 584 F.3d at 1180; *see Batson*, 476 U.S. at 96-8. The only dispute here is whether the state courts reasonably applied *Batson*'s third step. To make this determination, we must consider the "totality of the relevant facts" to decide "whether counsel's race-neutral explanation for a peremptory challenge should be believed." *Kesser v. Cambra*, 465 F.3d

351, 359 (9th Cir. 2006) (en banc) (quoting *Hernandez v. New York*, 500 U.S. 352, 363, 365 (1991)).

We review *de novo* a district court's denial of a habeas corpus petition. *Campbell v. Rice*, 408 F.3d 1166, 1169 (9th Cir. 2005) (en banc).

## B

**[1]** We first consider whether to adopt the mixed-motives approach employed by the district court. Under mixed-motives analysis, the court's inquiry does not end with the evaluation of the prosecutor's motives at *Batson*'s third step.

> [W]here both race-based and race-neutral reasons have motivated a challenged decision, a supplementary analysis applies. In these situations, the Court allows those accused of unlawful discrimination to prevail, despite clear evidence of racially discriminatory motivation, if they can show that the challenged decision would have been made even absent the impermissible motivation, or, put another way, that the discriminatory motivation was not a "but for" cause of the challenged decision.

*Kesser*, 465 F.3d at 372 (Wardlaw, J., concurring).

The district court grudgingly adopted the mixed-motives approach "based on the weight of existing federal precedent." *See Gattis v. Snyder*, 278 F.3d 222, 232-35 (3d Cir. 2002); *Wallace v. Morrison*, 87 F.3d 1271, 1274-75 (11th Cir. 1996) (per curiam); *Jones v. Plaster*, 57 F.3d 417, 420-22 (4th Cir. 1995); *United States v. Darden*, 70 F.3d 1507, 1530-32 (8th Cir. 1995); *Howard v. Senkowski*, 986 F.2d 24, 27-30 (2d Cir. 1993). However, we decline to follow our sister circuits. Though the mixed-motives approach has obvious utility, adopting it here would be contrary to the weight of Ninth Circuit and Supreme Court precedent.

**[2]** In *Kesser*, our en banc panel declined to adopt the mixed-motives approach, despite an extensive concurring opinion advocating its adoption. 465 F.3d at 371. Shortly after we decided *Kesser*, the Supreme Court revisited its *Batson* jurisprudence in *Snyder v. Louisiana*, 128 S. Ct. 1203 (2008). The *Court* in *Snyder* followed its existing approach, declining to adopt mixed-motives analysis for *Batson* cases:

> In other circumstances, we have held that, once it is shown that a discriminatory intent was a substantial or motivating factor in an action taken by a state actor, the burden shifts to the party defending the action to show that this factor was not determinative. *See Hunter v. Underwood*, 471 U.S. 222, 228 (1985). We have not previously applied this rule in a *Batson* case, and we need not decide here whether that standard governs in this context. For present purposes, *it is enough to recognize that a peremptory strike shown to have been motivated in substantial part by discriminatory intent* could not be sustained based on any lesser showing by the prosecution.

*Id.* at 1212 (emphasis added). The Court also alluded to the difficulty of determining on collateral review which of the prosecutor's motives were "but for" causes. *Id.* ("Nor is there any realistic possibility that this subtle question of causation could be profitably explored further on remand at this late date, more than a decade after petitioner's trial.").

**[3]** Though adopting the mixed-motives approach would set us in the company of five sister circuits, we and the Supreme Court have declined to do so. Therefore, we reject the district court's mixed-motives analysis, and limit our inquiry to whether the prosecutor was "motivated in substantial part by discriminatory intent." *Id.*

## C

**[4]** To determine whether race was a substantial motivating factor—that is, whether the defendant has shown "purposeful

discrimination" at *Batson*'s third step—the trier of fact must evaluate "the persuasiveness of the justification[s]" offered by the prosecutor. *Purkett v. Elem*, 514 U.S. 765, 768 (1995). "In deciding if the defendant has carried his burden of persuasion, a court must undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Batson*, 476 U.S. at 93 (internal quotation marks and citation omitted). This inquiry includes "side-by-side comparisons" of the African American panelists who were struck and white panelists who were allowed to serve. "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005).

Here, the California Court of Appeal failed to undertake any meaningful inquiry into direct or circumstantial evidence of the prosecutor's intent in striking the jurors.[1] The court merely "reiterat[ed] the prosecutor's stated reasons, and then [found] they were race-neutral." *Green v. Lamarque*, 532 F.3d 1028, 1031 (9th Cir. 2008). However, the trial court did consider the prosecutor's proffered justifications and the relevant facts. The judge discussed the justifications and indicated that he found them persuasive. By concluding that the stated criteria were "not pretext," and "not systematic," the trial court made the finding required at *Batson*'s third step. This factual finding is entitled to appropriate deference. *See Batson*, 476 U.S. at 98 n.21. In particular, we must defer to the trial judge's findings regarding the demeanor of the individuals in the courtroom. *Hernandez*, 500 U.S. at 365 ("As with the state of mind of a juror, evaluation of the prosecu-

---

[1]Though *Batson* did not explicitly require a judge to describe his analysis on the record, the Court in *Miller-El*, 545 U.S. at 241, "*presumed* the trial court and state appellate court did not undertake [such] analysis because [it] was not detailed in their opinions." *Green v. Lamarque*, 532 F.3d 1028, 1030 n.2 (9th Cir. 2008).

tor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.' ") (citations omitted).

We review the state court's finding that the prosecutor did not engage in purposeful discrimination under the deferential standard of the Antiterrorism and Effective Death Penalty Act ("AEDPA").[2] 28 U.S.C. § 2254(d)(2); *see Ali*, 584 F.3d at 1181 (according deference despite California courts' failure to employ comparative juror analysis). Under § 2254(d)(2),[3] we must defer to the California trial court's conclusion that there was no discrimination unless that finding "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

### 1. Juror Watkins

The prosecutor gave six reasons for challenging Juror Watkins: (1) she reported that her brother had been a victim of a crime, though in reality he had been convicted of a shooting following an unsuccessful self-defense claim; (2) she indicated she believed there were problems with the criminal justice system but was "not sure" what they were; (3) she had worked as an accounting clerk in a law firm; (4) some of her

---

[2]The dissent argues that "where a state court fails to apply comparative juror analysis in making its factual determination regarding pretext, no AEDPA deference is due . . . ." Dissent Op. at 553. Assuming for the sake of argument that this statement was correct prior to our opinion in *Ali*, it is no longer accurate. *See* 584 F.3d at 1181. Our decision in Ali clarified that even if the trial court and the California Court of Appeal "did not engage in comparative juror analysis," *id.* at 1179, where the "relevant evidence is found in answers to juror questionnaires and a transcript of voir dire, both of which were before the California Court of Appeal, . . . [s]ection 2254(d)(2) . . . applies," *id.* at 1181 n.4.

[3]We apply § 2254(d)(2) instead of § 2254(e)(1) because our review of the state court's factual determination is based entirely on information that was contained in the state court record. *See Kesser*, 465 F.3d at 358 n.1. As in *Kesser*, the juror questionnaires and transcripts of voir dire in this case were before the California courts.

acquaintances smoked marijuana; (5) she indicated bias in her evaluation of law enforcement; and (6) she mentioned that missing work for a long trial would be problematic. The magistrate judge concluded the prosecutor's strike was permissible, but the district court reached the same result only after applying mixed-motives analysis.

[5] The prosecutor noted that the first justification was his primary motivation for the strike. We conclude this concern was sincere and well-founded. The jury questionnaire asked whether the juror knew anyone who had been a *victim* of a crime. In response to this question, Watkins reported that her brother "shot someone in self-defense." In reality, Watkins' brother had been the perpetrator; self-defense was an unsuccessful defense to prosecution. The brother was convicted and served seven years, and Watkins said her family felt the result had been unfair. The prosecutor surmised that Watkins' statements about her brother's conviction made her feel "the government is treating an African American person differently," or that an "inward" bias had resulted. He went on to say that "the whole scenario" excluded her from jury service.

[6] Though the prosecutor mentioned race in stating his concern with Watkins and her brother's conviction, the record reveals that his primary concern was the effect of this incident on Watkins' perception of the criminal justice system. He focused on the conviction and Watkins' description of the circumstances, rather than her race, and challenged her for cause on that basis. The trial court apparently understood it that way. When the defense responded to the prosecutor's justifications, the trial court noted:

> Don't you concede that's a pretty significant event in someone's life that . . . potentially brings somebody into a jury who is going to be hyper vigilant, or possibly or likely require a powerfully convincing form of proof before they [sic] could convict someone because they [sic] have seen the court system,

through whatever facilities it may be, whether it be in the form of racial prejudice or just inefficiency, and/or police chicanery, they [sic] have seen the court system fail in a very painful way . . . . If you can't consider that as an important factor in gauging someone's attitude towards [sic] the criminal justice system and the trial process, I don't know what you can consider . . . .

The defense acknowledged that the judge's comment indicated "[the judge] would think that's a pretty genuine reason for excluding a juror."

**[7]** Comparative juror analysis also supports the prosecutor's justification. Cook points to two seated jurors who had nominally comparable circumstances, but upon close review, the parallels are weak. Juror 1 reported her cousin had been arrested 15 years earlier for shooting the cousin's brother-in-law. The cousin was released because the investigation proved it was self-defense. It does not appear the cousin was ever actually charged with a crime. Juror 1 appears to have been completely candid with the court and accurately characterized the events. Similarly, Alternate 3 (labeled Juror 15 in the record) reported that her father had been arrested for murder, but he was not charged. Again, it appears that she was candid with the court and accurately characterized the events.

**[8]** These differences are significant. Unlike Watkins, neither of the seated jurors' relatives were ever actually charged, let alone convicted. Unlike Watkins, both jurors accurately described the events, reporting them on the questionnaire as prior arrests or charges, not as victimization. Unlike Watkins, neither juror indicated she felt her relative had been treated unfairly. Because no similarly situated white jurors were permitted to serve, the evidence indicates this justification was legitimate and not pretextual.

**[9]** The prosecutor's second justification—Watkins' answer that she perceived problems with the criminal justice system, but was "not sure" what they were—is closely related to the first. This answer compounded the prosecutor's concern that, in light of her prior contact with the criminal justice system, Watkins would be an unreliable juror in a criminal case. By comparison, Jurors 1 and 15, whose relatives had been arrested, both said there were no problems with the criminal justice system. Only Juror 6 gave the same answer as Watkins, indicating that problems exist but he did not know what they were.[4] However, Juror 6 shared none of Watkins' other troubling characteristics. He is not an "otherwise-similar" juror, *see Miller-El*, 545 U.S. at 241, which nullifies any comparative value. The remaining jurors either indicated that there were no problems with the system, or indicated there were problems but gave concrete examples of those problems. Based on our review of Watkins' statements about her brother and their experience with the criminal justice system, we conclude the prosecutor's second justification is also persuasive.

The prosecutor's third justification is weak, but not clearly pretextual. The prosecutor mentioned that Watkins worked in a law firm, where she was an accounting clerk, though he stated this was not a "controlling" factor. We question whether an administrative role in a law firm would significantly affect a juror's views of the legal process, and the prosecutor did not expound on his reasoning. However, it is plausible that daily contact with lawyers would shape a person's perception of a trial, and a juror's occupation is generally a legitimate reason for a peremptory challenge. *See United States v. De Gross*, 960 F.2d 1433, 1438 n.8 (9th Cir. 1992). Comparative juror analysis supports this justification: no seated juror had ever worked in a law firm. There is no evidence from the questionnaires that this reason was pretextual.

---

[4]Juror 6 identified himself as Pacific Islander.

The prosecutor's fourth justification is also weak, but nonetheless supported by a comparative review of the questionnaires. The prosecutor mentioned that Watkins had acquaintances who smoked pot, which might indicate that she condoned such activity. Jurors 5 and 7 indicated that they used marijuana in the distant past. Jurors 9 and 11 indicated a relative had used pot in prior years. However, no non-African American juror said that his or her acquaintances used drugs in the present.[5] Juror 2 indicated his or her niece had a drug problem, which at first glance might support an inference of pretext. However, Juror 2 is also African American and therefore provides a weak basis for comparison. *See Miller-El*, 545 U.S. at 241 ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar *nonblack* who is permitted to serve . . . ." (emphasis added)). The presence of another African American with a similar characteristic supports the conclusion that the prosecutor was sincere when he said he was most concerned with Watkins' answers regarding her brother's conviction. Therefore, the questionnaire comparison supports this justification.

The prosecutor's remaining justifications are unpersuasive. The prosecutor's fifth justification was Watkins' answer to the question on the truthfulness of police testimony. The prosecutor stated he was concerned that Watkins did not believe

---

[5]This is an essential factual distinction. The dissent argues that comparative juror analysis between Watkins, an African American juror who had acquaintances who used drugs *contemporaneously* with the trial, and Jurors 5 and 7, non-African Americans who themselves used marijuana "many years ago" or "16 years ago," can only lead to one conclusion: "the prosecutor's asserted concern about condoning drug use was not his actual reason for striking Watkins." Dissent Op. at 565. However, based on the distinction between prior drug use and contemporaneous drug use, another conclusion can be made: the prosecutor was concerned that a juror with acquaintances currently using drugs, and currently breaking laws, would be more likely to condone a violation of the law than jurors who had used drugs several years ago.

police witnesses were always truthful. What she actually said was, "I don't believe police officers are always truthful, but I don't believe the civilian would be either." This mischaracterization of Watkins' answer is evidence of discriminatory pretext. *See Miller-El*, 545 U.S. at 244; *Ali*, 584 F.3d at 1190. Moreover, seated Jurors 1, 5, 6, and 10 gave similar answers, supporting the inference of pretext. *See Miller-El*, 545 U.S. at 241. Similarly, the justification that Watkins faced "work pressures" resulting from "too long of a case" is unpersuasive. Many, if not most, jurors would feel some hesitation about missing work for an extended period of time. Jurors 6 and 10 gave similar answers. These comparisons undermine the prosecutor's reliance on this justification and provide evidence of pretext. *Id.*

**[10]** In sum, the prosecutor gave four legitimate and two illegitimate grounds for striking Juror Watkins. The prosecutor's two primary motivations are quite persuasive and are unrefuted by the record. Had he stopped talking after giving his first two justifications, this strike would be exceptionally easy to review. Because of the weaker and implausible justifications, however, each of the reviewing courts has concluded that Juror Watkins presents a difficult question. Careful review of the record ultimately supports the conclusion that the prosecutor was sincerely and justifiably concerned with Watkins' views of, and her brother's experience with, the criminal justice system. The state court's conclusion that valid grounds, and not race, motivated the strike, was not objectively unreasonable.

### 2.  Juror Reynolds

The prosecutor gave four justifications for challenging Juror Reynolds: (1) Reynolds' skepticism regarding circumstantial evidence; (2) his weird appearance; (3) his excessive eagerness to serve and focus on race; and (4) his views on the O.J. Simpson case.

**[11]** The prosecutor expressly stated that he relied "primarily" on Reynolds' answers about circumstantial evidence. Reynolds indicated on his questionnaire, even after being given the typical instruction on the valid uses of circumstantial evidence, that he had some "quarrel with this rule of law," and that he would not follow the rule that circumstantial evidence could be relied upon. After the judge explained the concept to the prospective jurors, Reynolds still expressed hesitation about relying on circumstantial evidence. The prosecutor challenged Juror Reynolds for cause, and his concern with Reynolds' ability to follow the law appears sincere. As the magistrate noted, "[a]ny reasonable prosecutor would challenge this juror" because of his statement that he would not follow the law. Comparative juror analysis indicates this justification was sincere. No seated juror expressed hesitation about relying on circumstantial evidence. We therefore find the prosecutor's primary reason persuasive.

The prosecutor's remaining justifications relate largely to Reynolds' demeanor. He first stated Reynolds was "weird in appearance" and improperly groomed because he was wearing a t-shirt. Second, when asked why he wanted to be a juror, Reynolds responded: "I have never been a juror, and I think that being a black person, a lot of people have died for me to get this right of all colors, not just black people, so I'm honored to be here." Finally, in discussing the O.J. Simpson case, he stated, "it pays to have wealth."

**[12]** Taken individually, these factors might seem so innocuous they would not support a peremptory challenge. However, considered together, it is plausible that an unbiased prosecutor would be concerned by the juror's overall demeanor. *See Snyder*, 128 S.Ct. at 1208 ("In addition, race-neutral reasons for peremptory challenges often invoke a juror's demeanor (*e.g.*, nervousness, inattention), making the trial court's first-hand observations of even greater importance."); *Williams v. Rhoades*, 354 F.3d 1101, 1109 (9th Cir. 2004) (citing *Burks v. Borg*, 27 F.3d 1424, 1429 & n.3 (9th Cir.

1994) for the proposition that "[a] prosecutor's evaluation of a juror's demeanor, tone, and facial expressions may lead to a 'hunch' or 'suspicion' that the juror might be biased, and that a peremptory challenge based on this reason would be legitimate"). Though the questionnaire elicited the jurors' views on race, Reynolds' statement, "a lot of people have died for me to get this right of all colors, not just black people," is strangely and strongly phrased. Similarly, though many jurors commented on the O.J. Simpson case, Reynolds' reaction is uniquely cynical and could plausibly indicate bias in favor of defendants who do not have wealth. None of the seated jurors gave similar statements about being a juror or their views of the O.J. Simpson case. Therefore, the state court reasonably concluded that the prosecutor's reasons were not pretext for racial bias.

### 3.   Juror Singleton

The prosecutor gave five reasons for striking Juror Singleton: (1) Singleton stated that he had three grown children but did not know their ages or whereabouts; (2) his statement that law-enforcement testimony could be "self-serving;" (3) his statement that he had been a victim of racism; (4) Singleton didn't want to serve and had some medical problems; and (5) he had been court-martialed for driving under the influence and domestic problems.

[13] Here, the prosecutor's main rationales related incidentally to race, but it appears he was ultimately concerned with the effect prior experiences of racism would have on Singleton's attitude toward the trial. The prosecutor cited the court-martial as the "most troubling," followed by Singleton's description that he "was arrested once for something only because [he] was with a woman of another race." Singleton listed both incidents as "bad experience[s]" with law enforcement. The prosecutor claimed Singleton's response

> places the Government in this case, who has to pro-
> duce law enforcement officers, and seeks credibility,

that places me in a situation where he may be inclined to be sympathetic and leaning toward the defense in this case in light of the race of two of the defendants . . . and it seemed to me he was very emotional when he responded to the court. When you asked him about that, he was emphatic about that, certainly he was troubled by that . . . .

Moreover, Singleton answered "Yes" to the question, "Do you think this experience might cause you to be unfair to either side in *this* case?"[6]

Juror Singleton's answer, "I'm a black man in America," to a question about prejudice also troubled the prosecutor. The prosecutor compared Singleton to Jurors Green, Gilbert, and Barnes—three African Americans the prosecutor would have permitted to serve. He noted these three other prospective jurors had experienced racial prejudice, but their comments demonstrated they did not feel victimized. He was concerned that Singleton saw himself as a victim, which might translate into sympathy for the African American defendants, and that his attitude against law enforcement officers was a problem. Our comparative analysis supports this justification. Juror 2, the only African American to serve on the jury, also grew up in the deep South during the Jim Crow era. However, Juror 2 did not think his experiences would affect his impartiality, and did not give any strongly worded answers about race or racism.

The prosecutor gave two secondary supporting justifications. First, he mentioned that Singleton did not know the ages or whereabouts of his children. He expressed concern that this reflected poorly on his personal relationships and connection to the community. Though not a dispositive issue,

---

[6]During the hearing, Singleton changed his answer and said it wouldn't affect him. However, the prosecutor was consistent in giving more weight to questionnaire answers than those stated in open court.

it does bear on the prosecutor's overall impression of this juror. Similarly, the prosecutor was concerned that Singleton said law enforcement witnesses could be "self-serving." Unlike Juror Watkins' balanced and fair evaluation of police witnesses, Singleton's response reflects outright bias against law enforcement witnesses. A prosecutor who planned to call several law enforcement witnesses would be justifiably concerned with this view. No seated juror shared either of these characteristics, which supports the conclusion that these justifications, though secondary, are legitimate.

The prosecutor's last remaining justification is unpersuasive. He noted that Singleton did not want to serve. As noted above, this is true for many prospective jurors. Indeed, comparative analysis reveals Jurors 3 and 12 gave similar answers but were permitted to serve anyway. However, neither of these jurors shared any of Singleton's other troubling characteristics. We cannot conclude that, even if this reason was mere pretext, the prosecutor's primary motivation was race.

Though Juror Singleton presents a close case because of the prosecutor's reference to race, we ultimately agree with the district court that the stated reasons were not pretextual. We cannot say that the state court was objectively unreasonable in concluding that attitude, and not race, was the motivating factor.

### 4. Juror Parker

The prosecutor stated that he challenged Juror Parker because: (1) she lacked interpersonal experience, including the fact that she had never worked outside the home; (2) she stated she was unwilling to determine a person's state of mind from circumstantial evidence; and (3) she disapproved of accomplice testimony.

**[14]** There is no evidence in the record that these reasons were pretextual. Though the prosecutor's conviction that

homemakers have insufficient social skills to be good jurors strikes us as outdated, that justification has previously been validated. *See Stubbs v. Gomez*, 189 F.3d 1099, 1106-07 (9th Cir. 1999). In this case, it appears sincere, especially in light of Parker's other traits. The prosecutor also mentioned that Parker was "very quiet," and had answered she was "unsure" whether she could judge the believability of witnesses based on her own life experiences and knowledge of people. Both of these observations support the conclusion that Parker could have been a weak juror. Finally, in examining the members of the empaneled jury, we find that no other homemakers were permitted to serve.

The record also bears out the prosecutor's second justification. Parker stated on her questionnaire that she did not believe it was possible to determine mental state from facts and circumstances. The prosecutor called this belief "very disconcerting." Given the nature of the evidence presented in this case, we agree with the prosecutor's assessment. No seated juror gave such an answer or otherwise disapproved of the use of circumstantial evidence. The comparison therefore supports the inference that this reason was not pretextual.

Third, the prosecutor was concerned that Parker disapproved of accomplice testimony and bargaining for lesser charges in exchange for testimony. Parker left the question about accomplice testimony blank, and later said she disapproved of its use. Though these actions would generally be valid grounds for a strike, comparative juror analysis undermines this justification here. Other jurors gave comparable answers. Juror 5 wrote, "Neither approve or disapprove. In some cases a person's version of the truth may be swayed by an offer of leniency." Juror 6 also checked "disapprove." Juror 8 wrote, "I would approve as long as the witness is held accountable for his part in the crime." Juror 14 checked "disapprove" and wrote, "I feel that if you helped someone commit a crime, that you are just as responsible." Like Parker, all of these jurors indicated they would not reject any accomplice

testimony introduced at trial. Because four seated jurors questioned the use of accomplice testimony, this justification is suspect. However, none of these jurors shared any of Parker's other detracting characteristics, so we do not believe they are "otherwise-similar" for purposes of ascertaining pretext. *See Miller-El*, 545 U.S. at 241.

Finally, the prosecutor mentioned race in giving his justifications. He noted Parker left the question describing ethnic background blank, and questioned whether that meant she found the question offensive or had a "racial slant." However, he stated this was not "overly significant," and no seated juror omitted this answer. Therefore, we cannot conclude that Parker's omission of this answer was a substantial motivating factor in the prosecutor's decision to strike.

The state court reasonably concluded the motivating factor was Parker's disapproval of accomplice testimony and her lack of life experience. Both reasons are valid and not pretextual.

### 5. Juror Livingston-Blanks

The prosecutor stated that he challenged Juror Livingston-Blanks because: (1) her brother was a murder victim and she hesitated in her response to the court when questioned on the issue; (2) she stated she was the victim of domestic violence and false arrest, but further investigation showed that she was the offender in two domestic violence citations, rather than the victim; (3) she had worked for the County's Health and Human Services and Child Protective Services departments, which might indicate a liberal viewpoint and sympathy with the defendants; and (4) she listed the false arrest and domestic violence incidents as instances where she had a bad experience with law enforcement.

[15] The prosecutor indicated the first two reasons were the most important reasons for the strike. First was the murder of

Livingston-Blanks' brother. The prosecutor was concerned with "the same type of crime, the same nature of crime, how it might affect her ability here. I couldn't articulate—it's one of those feelings . . . she seemed to somewhat hesitate in responses to [the court] on that issue." Our review of the cold appellate record indicates Livingston-Blanks responded in a straightforward manner to the court's questions about her brother's murder. However, the prosecutor twice mentioned that she was hesitant in her answers, and neither the judge nor defense counsel disputed that characterization. The mere fact of the murder provides a legitimate justification for the strike. The fact that Livingston-Blanks was hesitant in her answers makes the justification even more persuasive. It also distinguishes her from seated Juror 6, whose brother-in-law was murdered.

The second stated justification, also very important to the prosecutor, was Livingston-Blanks' misleading statements to the court. She reported on her questionnaire that she was the victim of domestic violence and false arrest. The prosecutor's independent investigation showed that she had actually been the offender in two domestic violence citations. Cook claims this juror's questionnaire answer was ambiguous. However, the questionnaire clearly asks whether "you or anyone close to you [had] ever been the *victim* of a crime." She reported on the questionnaire that she had been falsely arrested and wrote "spousal abuse charge." She did not disclose that she had entered a guilty plea as the perpetrator of the spousal abuse. To the extent that Livingston-Blanks meant that her boyfriend had been a victim of her own actions, she could have indicated that in the next question, "have you . . . ever been *arrested* or *charged* of [sic] a crime . . . ?" She dishonestly checked "No" under that question. This lack of candor with the court, combined with the fact that she listed these domestic violence and false arrest incidents as bad experiences with law enforcement, provide ample, non-racial justification for the strike.

With respect to her work experience, the prosecutor explained why experience in those agencies might make Livingston-Blanks sympathetic to defendants. Though the prosecutor's logic in this respect is weak, the record on this factor pales in comparison to Livingston-Blanks' misrepresentations to the court. For the same reason, we reject Cook's attempts to compare Livingston-Blanks to Alternate 3, who was a licensed social worker, nurse, and nun; and Juror 6, whose brother-in-law had been murdered. Neither of these jurors misrepresented the salient facts of their criminal experiences to the court. The magistrate noted, "[n]o reasonable prosecutor would fail to strike a juror who arguably misled the court as to the facts of her personal criminal experience." The state court reasonably concluded the stated reasons were not pretext, and race was not a substantial or motivating factor for the strike.

## 6.   Juror Tillman

The prosecutor gave five reasons for challenging Juror Tillman: (1) he did not disclose to the court that he had been arrested for a DUI and that his girlfriend had recently assaulted him; (2) he stated in the questionnaire that law enforcement is not always truthful; (3) his response to a question about witness believability indicated an inability to discern lying under oath; (4) he might be inflexible as a juror because he said he could make up his own mind about what a "picture" represented; and (5) his aunt had been arrested for drug use.

[16] We agree with the magistrate judge that Juror Tillman presents a close case, but the evidence ultimately supports the prosecutor's strike. Here, the primary reason for the challenge was Tillman's failure to report his DUI and his girlfriend's assault. As we noted above, misrepresentations to the court regarding criminal experience are an extremely persuasive reason for using a peremptory challenge. Our review of Till-

man's questionnaire indicates he did, in fact, mislead the court about his experience with the criminal justice system.

The remainder of the prosecutor's stated reasons are unpersuasive. In response to the question, "Do you feel that a police officer's testimony will necessarily be more truthful or more accurate than that of a civilian witness?" Tillman responded, "No—they are still human." This answer indicates fairness, rather than bias against police officers. Moreover, Jurors 1 and 10 gave very similar answers, which supports an inference this reason was mere pretext.

Similarly, the prosecutor questioned Tillman's statements on truthfulness. Yet Tillman's answer simply restates the legal incentive created by perjury law: "Being that perjury is a crime, it does not allow a person to lie and feel they would not be caught." He indicated that even people with whom he personally disagreed could tell the truth. No seated juror gave a similar answer, but the prosecutor's justification still makes little sense.

The prosecutor's reference to inflexibility also strains credibility. He believed Tillman might be inflexible because he had answered he could look at a "picture" and make up his own mind about what the "picture" represented. However, he also answered that, "If I can really see their view," he would change his vote if his fellow jurors persuaded him his initial view had been incorrect. This, as the magistrate judge noted, is "the antithesis of inflexibility."

Finally, the fact that Tillman's aunt had used crank and had a drug problem is weak ground for a challenge. Non-black Jurors 9 and 11 also had relatives who had used drugs, though both noted the drug use was in the distant past. Only Juror 2, who is black, gave a comparable answer: his niece had a drug problem. Because the prosecutor passed on this African American juror with the same characteristic, we may take the prosecutor at his word that this factor was merely cumulative

in his decision to strike Tillman. Therefore, this factor does not weigh heavily on our analysis.

Tillman's misrepresentations to the court regarding his criminal experience would be more than adequate grounds for any prosecutor to use a peremptory challenge. Though the unpersuasive justifications are greater in number, the valid reason is overwhelming in substance, and we must consider the "totality of the relevant facts." *Kesser*, 465 F.3d at 359. Any bias betrayed by the prosecutor's subsequent strained and rambling reasons could not have been a substantial or motivating factor in the strike.

### 7. Juror Maxey

The prosecutor gave three reasons for challenging Juror Maxey: (1) she made a hardship request; (2) she was "addicted" to the O.J. Simpson case and CourtTV; and, (3) she noted two incidents she believed involved the use of excessive force by the police.

**[17]** Like many jurors, Maxey expressed reluctance about serving on the jury due to time constraints at work. However, she considered it significant enough to submit a hardship request because she was transferring jobs and serving would require her to work evenings and weekends, which still would not permit her to complete all of her pending work. The prosecutor considered her to be sufficiently reluctant that she might not be a diligent, attentive juror. No seated juror made a formal hardship request, so comparative analysis supports this justification.

Though many jurors stated that they had followed the O.J. Simpson case, Maxey admitted that it actually affected her perception of the legal process. She stated, "I suppose the exposure to the Simpson trial & CourtTV enlightened me that all are not honest." The prosecutor was concerned that she would form such a strong opinion based on TV. He made the

reasonable argument that judgments made in light of media coverage might not "bode well" for the prosecution. As mentioned above, no seated juror expressed strong views on the O.J. Simpson case. The Simpson case and the media's coverage were controversial topics nationwide. We conclude the prosecutor's concern was sincere, and our juror comparisons support this view.

Finally, Maxey had witnessed an officer use excessive force, but said it would not cause her to be unfair to either side in this case. She treated the issue as fairly minor during the hearing: "I believe I remember calling to try to report it, but I don't remember, it's been awhile ago. I don't think anything ever came of it." The prosecutor was nonetheless concerned that this would make her distrustful of law enforcement, the District Attorney's office, and the prosecution witnesses. Though Maxey treated it as a minor matter, the prosecutor noted that she cared enough to report it to the authorities. It seems quite plausible that the incident would affect her perception of law enforcement. Comparative juror analysis bears out this conclusion; no juror who was permitted to serve had witnessed any incidents of officers using excessive force.

The state court concluded these reasons were not pretextual. We agree, and therefore conclude race was not a significant motivating factor in the strike.

### 8.   Cumulative Evidence

The prosecutor struck seven black jurors. This unquestionably calls for a searching inquiry. On the other hand, he passed on three black jurors, two of whom were later struck by the defense, and gave clear reasons why he had affirmatively wished to have those jurors seated. These reasons were directly related to many of the reasons for which he had stricken the other jurors. For instance, the prosecutor passed on Juror Green, who, like Jurors Reynolds and Singleton,

indicated that she had been the victim of racial prejudice. The prosecutor expressed the same concern that such experiences might lead to a pro-defense tendency, but believed her other attributes—including her profession, raising a family, and having previously served on a jury—would make her a good juror.

Similarly, the prosecutor passed on Juror Gilbert, who, like Juror Parker, watched law-related TV shows. Gilbert, however, indicated that she put the shows in perspective and was not influenced by what she watched. Gilbert, like Watkins, had a close relative who had been convicted of a crime, but the prosecutor liked her "strong, no hesitation" responses that the relative had been treated fairly and was not a victim of the system. The prosecutor noted that Jurors Gilbert and Burns approved of accomplice testimony, making them favorable jurors for the prosecution, unlike Juror Parker. These comparisons indicate that the prosecutor was sincerely trying to evaluate each juror's attitude and characteristics based on his or her questionnaire responses, regardless of the person's race. One of the defense lawyers noted, "I think it bodes well for [the prosecutor] with regard to the pass issue."

The prosecutor also seems to have been consistent in his questioning of prospective jurors. He noted at the beginning of the *Batson* hearing that he placed more weight on the questionnaire responses, and preferred not to ask too many questions in voir dire. The judge commented that he had noticed the prosecutor's behavior in that respect; there was no indication that the judge believed the prosecutor had asked a greater or lesser number of questions of the jurors he struck. This consistency contrasts with *Miller-El*, where the prosecutor had questioned African American jurors more closely than white jurors on subjects equally applicable to both. Disparate questioning based on race supported the Court's conclusion that the prosecutor's stated justifications were mere pretext. 545 U.S. at 255-63. That was not the case here.

The prosecutor here also appears to have been consistent in his investigations of the jurors. He conducted an independent police records check on Tillman and Livingston-Blanks, which alerted him that they had not been honest about their criminal history. Responding to defense counsel's allegation that he had only investigated the African Americans, the prosecutor noted that he had also investigated a white juror on the basis of an odd questionnaire answer. His search turned up a criminal report, and he excluded her for cause. He said he would have conducted similar searches on other white prospective jurors if he had reason to do so.

Neither the trial court nor the California Court of Appeal made an explicit credibility finding, but the trial court's comments clearly bear on this inquiry. *See Snyder*, 128 S. Ct. at 1208 ("Step three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility and 'the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge.' ") (quoting *Hernandez*, 500 U.S. at 365). In ruling on the *Batson* motion, the court noted,

> [The prosecutor] has to try the case to a jury of twelve persons who are reasonably receptive to the prosecution's side of the case, and regardless of what someone's animosity to the police is based on, whether it's based on, in fact, injustice in the past, still that person very likely brings into the jury box some hostilities to the police process, and the prosecutorial process, so there can be, and in this case there is justification for the exclusion of [the challenged jurors.]

This, and the trial court's other statements, show the court was receptive to the prosecutor's stated justifications. The court apparently deemed the prosecutor credible when he stated that he had excused these jurors for reasons related to their views, experiences, and attitudes, rather than race itself.

**[18]** In sum, our review of the record in total indicates that the prosecutor gave both persuasive and unpersuasive justifications for his strikes. Even assuming the unpersuasive grounds were actually pretext, we cannot conclude his strikes were ultimately motivated in substantial part by race. As we held in *Kesser*, where "an evaluation of the voir dire transcript and juror questionnaires clearly and convincingly refutes each of the prosecutor's nonracial grounds," we must conclude that his "actual and only reason for striking [the juror] was her race." 465 F.3d at 360. Our review of the record reveals some of the prosecutor's reasons were unpersuasive, but the most significant justifications in each instance were entirely sound. It does not appear that race was the "only reason" for the strikes, or even that the prosecutor's actions were "motivated in substantial part by discriminatory intent." *Snyder*, 128 S. Ct. at 1212. Under AEDPA's deferential standard of review, we cannot conclude that the state court's finding that there was no discrimination was objectively unreasonable.

### III

Finally, we consider whether Cook suffered a violation of his Sixth Amendment right to an impartial jury. On the third day of deliberations, Juror 12 informed the judge that she had overheard a conversation between co-defendant Gomez and his attorney about two weeks earlier. Juror 12 believed the statements indicated the defendants were all present at the scene, which, if true, would seriously undermine their alibi defense.

Under the Sixth Amendment, Cook has a constitutional right to an impartial jury, the right to confront those who testify against him, and the right to conduct cross-examination. *See Duncan v. Louisiana*, 391 U.S. 145, 149 (1968); *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987); *Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965). The California Court of Appeal found, and the state does not dispute, that the incident here constituted jury misconduct. The Court of Appeal presumed

prejudice but concluded the error was harmless because the prejudice was "sufficiently dissipated by several factors."

We review this finding *de novo* as a mixed question of law and fact. *See Sassounian v. Roe*, 230 F.3d 1097, 1108 (9th Cir. 2000). Cook is entitled to habeas relief only if the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). In making this determination, we consider the following factors:

> (1) whether the extrinsic material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the jury discussed and considered it; (4) whether the material was introduced before a verdict was reached, and if so, at what point in the deliberations it was introduced; and (5) any other matters which may bear on the issue of . . . whether the introduction of extrinsic material [substantially and injuriously] affected the verdict.

*Lawson v. Borg*, 60 F.3d 608, 612 (9th Cir. 1995) (alterations in original) (quoting *Bayramoglu v. Estelle*, 806 F.2d 880, 887 (9th Cir. 1986)). Within the fifth factor, we look to other considerations that "might nonetheless suggest that the potential prejudice of the extrinsic information was diminished in a particular case." *Sassounian*, 230 F.3d at 1109 (quoting *Jeffries v. Wood*, 114 F.3d 1484, 1491 (9th Cir. 1997) (en banc), *overruled on other grounds by Lindh v. Murphy*, 521 U.S. 320 (1997)). These considerations may include:

> (1) whether the prejudicial statement was ambiguously phrased; (2) whether the extraneous information was otherwise admissible or merely cumulative of other evidence adduced at trial; (3) whether a curative instruction was given or some other step taken to ameliorate the prejudice; (4) the trial context; and (5) whether the statement was insufficiently prejudicial given the issues and evidence in the case.

*Id.*

There is no question that the information was actually received before the jury reached a verdict. However, the other factors support the conclusion that the misconduct was not prejudicial. Juror 12 told the other jurors about the incident at 3:45 p.m. on Friday. The foreperson immediately told the other jurors to disregard the information and told Juror 12 that she was wrong to share it. The jury stopped deliberating ten minutes later. Juror 12 left a message for the trial judge the same day, and he addressed it first thing on Monday morning.

More importantly, the trial judge conducted a full hearing and questioned each juror individually. "[T]he Supreme Court has stressed that the remedy for allegations of jury bias is a *hearing*, in which the trial court determines the circumstances of what transpired, the impact on the jurors, and whether or not it was prejudicial." *United States v. Dutkel*, 192 F.3d 893, 899 (9th Cir. 1999) (internal quotation marks omitted). Each juror, including Juror 12, indicated he or she could disregard the statement. Out of an abundance of caution, the trial court dismissed Juror 12. The hearing revealed that the jurors perceived the comment as minor in light of the entire body of trial evidence. As Juror 4 noted, "There's certainly a lot of evidence to consider in this trial without considering or giving any wait [sic] to that comment."

**[19]** Finally, the jury was instructed to base its decision on the facts and the law as stated by the judge, and admonished to disregard the extrinsic information. We presume that jurors follow the instructions given, *Weeks v. Angelone*, 528 U.S. 225, 234 (2000), and there is no evidence in the record that the jury failed to do so here. The district court correctly concluded that Juror 12's misconduct did not have a substantial or injurious effect on the jury's verdict.

## IV

We conclude Cook did not suffer any violation of his rights under the Fourteenth or Sixth Amendments.

AFFIRMED.

**Volume 2 of 2**

HAWKINS, Circuit Judge, Concurring in part and Dissenting in part:

I agree with and applaud the majority's adoption of the "substantial or motivating factor" test to determine challenges under *Batson v. Kentucky*, 476 U.S. 79 (1986). In recent *Batson* cases, the Supreme Court has specifically declined to adopt the "but for" causation requirement. *See Snyder v. Louisiana*, 128 S. Ct. 1203, 1212 (2008) (declining to require "but for" causation and explicitly noting that the Court had never previously applied such a requirement); *Miller-El v. Dretke,* 545 U.S. 231 (2005) ("*Miller-El II*") ; *Miller-El v. Cockrell*, 537 U.S. 322, 346 (2003) ("*Miller-El I*") ("Even though the practice of jury shuffling might not be denominated as a *Batson* claim because it does not involve a peremptory challenge, the use of the practice here tends to erode the credibility of the prosecution's assertion that race was not *a motivating factor* in the jury selection.") (emphasis added).

Moreover, although the initial three-step framework of *Batson* does derive from Title VII jurisprudence, the "but for" causation requirement that has been applied in those contexts, *see, e.g.*, *Costa v. Desert Palace*, 539 U.S. 90, 94-95 (2003); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977), is not appropriate in the distinct *Batson* context. The difficult task of "ferreting out discrimination" would be made nearly impossible by a "but for" causation requirement, which would require a court to engage in counterfactual reasoning, often with only a sparse record to guide it. *See Kesser v. Cambra*, 465 F.3d 351, 376-77 (9th Cir. 2006) (en banc) (Berzon, J. concurring).

Jury selection is a brief process in which peremptory challenges are based on a prosecutor's judgments or feelings alone,[1] with little, if any, recorded discussion. *See Miller-El II*, 545

---

[1]The attempt of the prosecutor in the present case to explain his rationale for one strike as "one of those feelings" is illustrative.

U.S. at 239 (noting the "practical difficulty of ferreting out discrimination in selections discretionary by nature, and choices subject to myriad legitimate influences, whatever the race of the individuals on the panel from which jurors are selected"). Permitting blatant instances of discrimination to go undeterred in such circumstances, however, would be contrary to *Batson*'s purpose, eviscerate its protections in many cases, and erode public confidence in the neutrality of the criminal justice system. *See Miller-El II*, 545 U.S. at 238 (stating that "the very integrity of the courts is jeopardized when a prosecutor's discrimination invites cynicism respecting the jury's neutrality, and undermines public confidence in adjudication") (internal quotation marks and citation omitted); *Powers v. Ohio*, 499 U.S. 400, 411 (1991) ("[R]acial discrimination in the selection of jurors 'casts doubt on the integrity of the judicial process.' ") (quoting *Rose v. Mitchell*, 443 U.S. 545, 556 (1979); *see also Wilkerson v. Texas*, 493 U.S. 924, 928 (1989) (Marshall, J., dissenting from denial of certiorari) (stating that racial discrimination in jury selection is "perhaps the greatest embarrassment in the administration of our criminal justice system").

Where I part company with the majority is in its application of the "substantial or motivating factor" standard to the challenge Matthew Cook ("Cook") makes here. For me, the proper application of that test would, as the district court stated, lead to a grant of Cook's habeas petition. I reach this conclusion because the prosecutor's treatment of African-Americans contrasts starkly with his far different treatment of non-African-Americans. Any fair comparison of the seven strikes he exercised and those he declined to strike demonstrates that his conduct violated Cook's rights under *Batson* and its progeny.

When the dust settled from jury selection, the prosecutor had struck seven out of nine African-American venirepersons (77%) while striking only twenty-three out of ninety non-African-American venirepersons (26%), using 23% of his

challenges against African-Americans even though they comprised only approximately 11% of the jury pool.

Finding that the defense had established a prima facie case, the trial court required the prosecutor to state his reasons for exercising the seven peremptory challenges. Although there was a general analysis of the credibility of these explanations, the trial court did not consider each strike individually. It found that the prosecutor had "used reasonable, acceptable criteria" that were not pretextual or a "systematic . . . effort to exclude black persons from this jury." The case went to trial before a fifteen-person jury with one African-American,[2] and Cook was convicted on all counts.

Prior to voir dire, prospective jurors completed a questionnaire,[3] which the prosecutor claims to have heavily relied

---

[2]The jurors self-identified their "ethnic background[s]" as follows: seven "white" or "Caucasian," one "Asian," one "black," one "Croatian," one "Irish," one "Italian American," one "Mexican American," and one "Pacific Islander" (Juror 11's background is unclear from the record). "[T]he presence of one African-American on the jury does not preclude a *Batson* challenge," *United States v. Torres-Ramos*, 536 F.3d 542, 558 (6th Cir. 2008), because the "more powerful" comparison is between "black venire panelists who were struck and white panelists allowed to serve." *Miller-El II*, 545 U.S. at 241; *see also Turner v. Marshall*, 63 F.3d 807, 814 (9th Cir. 1995) ("In denying a *Batson* motion . . . a trial court may not rely solely on the fact that some African-Americans remain on the jury."), *overruled on other grounds by Tolbert v. Page*, 182 F.3d 677, 685 (9th Cir. 1999).

[3]The questionnaire included the following questions, among others:

- "How would you describe your ethnic background?";
- "How closely did you follow the O.J. Simpson trial?";
- "How, if at all, did the O.J. Simpson trial affect your view of the courts and the criminal justice system?";
- "Some people think that everyone is biased to some degree. What do you think of that statement?";
- "Would you say that you were raised in an atmosphere free of prejudice?"

upon in deciding to exercise strikes.[4] In response to the defendants' *Batson/Wheeler* motion, the prosecutor explained his strikes against each of the seven venirepersons.

On direct appeal, the California Court of Appeal concluded the reasons given for each peremptory challenge were reasonable and race neutral. However, in affirming the trial court's denial of the defendant's motion, the court gave no indication why it credited the prosecutor's justifications. Faced with a *Batson* challenge, a court has a "duty to determine whether the defendant . . . established purposeful discrimination." *Lewis v. Lewis*, 321 F.3d 824, 834 (9th Cir. 2003). The Court of Appeal instead erroneously required only one of the prosecutor's stated reasons to appear valid on its face in order to sustain each peremptory challenge.

Noting an absence of binding Ninth Circuit authority on the appropriate standard for adjudicating pretext in *Batson* claims, the district court relied on precedent from other circuits and reluctantly adopted the "but for" approach borrowed from employment discrimination "mixed-motives" cases. *Cook v. La Marque*, No. CIV S-02-2240 LKK GGH P, 2008 WL 1701690, at *1 (E.D. Cal. Apr. 9, 2008) ("[T]he court adopts mixed motives analysis based on the weight of existing federal precedent . . . If the court were to decide the matter in the first instance, however, it would likely come to a different

---

Additionally, the questionnaire asked venirepersons to indicate their level of concurrence with statements regarding minority stereotypes and difficulties faced by minorities as well as questions regarding legal concepts, including the credibility of witnesses, expert opinions, circumstantial evidence, and accomplice liability.

[4]During the *Batson/Wheeler* proceeding, the prosecutor stated: "I have found that jurors are more frank within their responses in the questionnaire, and I believe that they are easily influenced in rehabilitation . . . so I put a lot of deference to the questionnaire. . . . I don't ask a lot of follow-up questions in voir dire, because I believe the questions are more specific than I could restate them in court."

conclusion . . . Whatever the merits of mixed motives analysis at the trial court level, it is ill-suited for collateral and direct review.") (citations omitted).

The district court noted that if it had not applied the "but for" standard, it would have concluded that "the discriminatory reason tainted the peremptory strike [of Watkins] and grant[ed] habeas relief on that basis" because "legitimate and illegitimate reasons both independently motivated the strike." The court further found that the prosecution's surmise that Watkins "believe[d] that African-Americans were treated differently in the criminal justice system, even though Ms. Watkins had never expressed such a belief," was a "discriminatory reason that also motivated the strike." The court nevertheless denied the petition because it concluded that the discriminatory reason, while a substantial motivation for the strike, was not necessarily its "but for" cause.

Denials of habeas petitions are reviewed de novo. *Campbell v. Rice*, 408 F.3d 1166, 1169 (9th Cir. 2005) (en banc). Factual findings by the district court are reviewed for clear error. *Stankewitz v. Woodford*, 365 F.3d 706, 714 (9th Cir. 2004).

Our review of the state appellate court's finding that the prosecutor did not engage in purposeful discrimination is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), dictated by 28 U.S.C. § 2254(d)(2). Where, as here, our review of a state court's factual determination is based entirely on information that was contained in the state court record, we would ordinarily defer to the last reasoned state court opinion's factual findings unless they were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Ali v. Hickman*, 584 F.3d 1174, 1181 (9th Cir. 2009); 28 U.S.C. § 2254(d)(2); *see also Kesser*, 465 F.3d at 358 n.1 (citing *Taylor v. Maddox*, 366 F.3d 992 (9th Cir. 2004). The AEDPA standard of review is "demanding but not insatiable" and

"deference does not by definition preclude relief." *Miller-El II*, 545 U.S. at 240.

However, where a state court fails to apply comparative juror analysis in making its factual determination regarding pretext, no AEDPA deference is due because its failure to compare seated jurors with excused jurors in conducting its analysis is contrary to federal law. *See Kesser*, 465 F.3d at 358. Here, the state court failed to determine whether the prosecutor's non-racial motives were pretextual by employing comparative juror analysis and evaluating "the persuasiveness of the justification" and "whether counsel's race-neutral explanation for a peremptory challenge should be believed." *Id.* at 358-61 (internal quotation marks and citations omitted); *see also People v. Lenix*, 44 Cal. 4th 636, 658 (2008) ("[E]vidence of comparative juror analysis must be considered in the trial court and even for the first time on appeal if relied upon by defendant and the record is adequate to permit the urged comparisons."). Because the California Court of Appeal employed the incorrect legal standard, this court may examine petitioner's *Batson* claim de novo. *See Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (when a state court's adjudication of a claim "is dependent on an antecedent unreasonable application of federal law," a federal court must "resolve the claim without the deference AEDPA otherwise requires").

As the majority notes, Cook having established a prima facie case of discrimination and the prosecution having stated reasons for its strikes, the only remaining issue concerns the third step in the *Batson* analysis: purposeful discrimination. At this stage, the court must "determine if the defendant has established purposeful discrimination" by evaluating the prosecutor's proffered reasons. *Batson*, 476 U.S. at 98. "While subjective factors may play a legitimate role in the exercise of challenges, reliance on such factors alone cannot overcome strong objective indicia of discrimination." *Kesser*, 465 F.3d at 359 (quoting *Burks v. Borg*, 27 F.3d 1424, 1429 (9th Cir.

1994)); *see also Miller-El II,* 545 U.S. at 252. As the Supreme Court noted in *Miller-El II*, while the exercise of peremptory challenges are often a matter of instinct and it can sometimes be hard to say what the reason is, when illegitimate grounds like race are at issue, a prosecutor must state the reasons for each challenge, which will stand or fall on the plausibility of the reasons given. A *Batson* challenge does not call for a mere exercise in "thinking up any rational basis." 545 U.S. at 252.

To determine whether a defendant has shown "purposeful discrimination," the trier of fact must evaluate "the persuasiveness of the justifications" offered by the prosecutor to determine whether race was a substantial or motivating factor. *Kesser*, 465 F.3d at 359 (citing *Purkett v. Elem*, 514 U.S. 765, 768 (1995)). As the Supreme Court has stated:

> [T]he critical question in determining whether a prisoner has proved purposeful discrimination . . . is the persuasiveness of the prosecutor's justification for his peremptory strike. At this stage, "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." In that instance the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy . . . Deference [to the trial court] is necessary because a reviewing court, which analyzes only the transcripts from voir dire, is not as well positioned as the trial court is to make credibility determinations.

*Miller-El I*, 537 U.S. at 338-39 (quoting *Purkett*, 514 U.S. at 768). Here, however, the state trial court failed to evaluate the "totality of the relevant facts" to decide "whether counsel's

race-neutral explanation for a peremptory challenge should be believed." *Kesser*, 465 F.3d at 359.

While determining motive in this area is difficult, side-by-side comparisons (potential jurors who were struck versus those who were not) can be critical in establishing purposeful discrimination. *Miller-El II*, 545 U.S. at 241 ("More powerful than these bare statistics, however, are side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve."); *id.* at 252 ("The whole of the voir dire testimony subject to consideration casts the prosecution's reasons for striking [the struck venireperson] in an implausible light. Comparing his strike with the treatment of panel members who expressed similar views supports a conclusion that race was significant in determining who was challenged and who was not.").[5]

Once an inference of race-based strikes has been established, the court need not blindly accept just any non-racial excuse. *Kesser*, 465 F.3d at 358 (citing *Johnson v. Vasquez*, 3 F.3d 1327, 1331 (9th Cir. 1993) ). The court must evaluate the record and consider each explanation within the context of the trial as a whole because "[a]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts." *Hernandez v. New York*, 500 U.S. 352, 363 (1991) (plurality opinion) (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)); *Kesser*, 465 F.3d at 359. "If a prosecutor's

---

[5]*See also Batson*, 476 U.S. at 93 (courts should consider "such circumstantial and direct evidence of intent as may be available"); *Lewis*, 321 F.3d at 830-33 (employing a comparative analysis of the struck juror with empaneled jurors); *McClain v. Prunty*, 217 F.3d 1209, 1220 (9th Cir. 2000) (noting that the "prosecutor's motives may be revealed as pretextual where a given explanation is equally applicable to a juror of a different race who was not stricken by the exercise of a peremptory challenge"); *Turner v. Marshall*, 121 F.3d 1248 1251-52 (9th Cir. 1997) ("A comparative analysis of jurors struck and those remaining is a well-established tool for exploring the possibility that facially race-neutral reasons are a pretext for discrimination.").

proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination." *Miller-El II*, 545 U.S. at 241. "The fact that [a proffered] reason also applied to these other panel members, most of them white, none of them struck, is evidence of pretext." *Id.* at 248.

As in *Kesser*, where the state court failed to consider any "evidence outside of the prosecutor's own self-serving *Batson* testimony," 465 F.3d at 358-61, this case is well-suited for appellate application of comparative juror analysis because of the prosecutor's contemporaneous, recorded justifications for the strikes and the timing of the *Batson/Wheeler* hearing, which was conducted before the original trial was completed and soon after voir dire and the allegation of misconduct.

Finally, if impermissible biases are shown to be a "motivating factor" in the peremptory challenges, the *Batson* motion should be granted. *See Snyder*, 128 S. Ct. at 1212.

**Potential Juror Watkins**

The prosecutor gave a litany of reasons for striking Watkins,[6]

---

[6]He explained his decision to strike Watkins as follows: (1) she "believes her brother was unjustly prosecuted . . . and he went to prison for 7 years, she believes it was in self-defense, the inference being he was wrongly convicted" which could affect her perception of the criminal justice system; (2) she may think "the government is treating an African-American person differently" and thus might have "an inward bias"; (3) "she doesn't believe police officers are always truthful"; (4) she might have "a hidden agenda, whether or not she would be a nullification vote"; (5) she stated she "saw problems with the criminal justice system" but was "not sure" what those problems were, which "[left] a void somewhere" for the prosecutor; (6) she indicated "she would not be able to give her full attention to the trial because of work pressures"; (7) she "works as an accounting clerk in a law firm . . . people that work in the legal field somewhat have a difficult time with issues"; (8) her answer that she was "not

a 37-year-old married African-American woman, who was a college graduate working as an accounting clerk at a law firm. Although some of the proffered explanations may appear plausible at first blush, when read in context and in comparison with seated jurors, they appear pretextual. *See Miller-El II*, 545 U.S. at 241 (side-by-side comparisons serve as "evidence tending to prove purposeful discrimination"). Without evaluating each of these justifications individually or performing comparative juror analysis, the California Court of Appeal upheld the trial court's determination as long as one legitimate race-neutral explanation existed for the strike. The Court of Appeal stopped at the second step of the *Batson* analysis, where the facial validity of the prosecutor's reasons were determined, and failed to consider whether any of the proffered reasons were pretextual.

As in another recent Ninth Circuit *Batson* case, the record pertaining to venireperson Watkins convinces me "that each of the prosecutor's justifications is logically implausible, undermined by a comparative juror analysis, and otherwise unsupported by the record." *Ali*, 584 F.3d at 1182. Because "an evaluation of the voir dire transcript and juror questionnaires clearly and convincingly refutes each of the prosecutor's nonracial grounds," I conclude that his "actual and only reason for striking [the venireperson] was her race." *Kesser*, 465 F.3d at 360.

First, the prosecutor claimed that Watkins "believes her brother was unjustly prosecuted" and "was wrongly convicted," which could affect her perception of the criminal justice

---

sure" whether she would change her vote "if she was persuaded her initial view was right" indicated to the prosecutor that she "is inflexible"; (9) "she indicated that she has friends that use marijuana. One can draw an inference from that, that she condones the use of marijuana, thus, that would be violating the law. She may find certain laws of such a nature that she personally feels she can disregard them, or is morally disinclined to follow them."

system. *See supra* note 6. On her questionnaire, Watkins reported that twenty years earlier her brother was convicted of a shooting that her parents had told her was "in self defense." In response to questions during voir dire, Watkins stated that her brother's conviction, which occurred when she was only seventeen years old and lived in Alabama, would not affect her at trial and did not engender any ill feeling toward the police or prosecutors in Sacramento County.

Despite Watkins's statements that her brother's conviction would not affect her judgment in this case, the prosecutor provided the first reason for striking Watkins:

> She may . . . perceive that . . . the government is treating an African-American person differently. She may see, there may be an inward bias. I'm not saying there is, that might be the driving force. That's a concern, just not that fact, but the whole scenario excludes her, from our point of view.

The district court found, "the prosecutor's inferential presumption that because Watkins thought her brother wrongly convicted, it might mean that she would be race conscious in her deliberations if chosen to be a juror." Such a presumption is highly problematic and suggests that the "prosecutor exercised challenges in part with a discriminatory mindset." Indeed, because the prosecutor never asked her, it is not even certain that Watkins thought her brother was wrongly convicted.[7] In response to the court's questions, she testified that her brother's trial occurred when she was a minor, that all of her information about it came from her parents, and that her brother was convicted and served seven years in prison for the shooting. Watkins told the court, as she had stated on the questionnaire, that the incident would not affect her judgment in the case or her feelings toward police.

---

[7]Although she described her brother as having acted in "self-defense," she may have been using the term colloquially rather than in its legal sense; she never indicated whether she herself believed he was innocent.

Additionally, Watkins never stated, or even implied, that she believed the government "treats African-Americans differently." The prosecutor's attribution was based solely on Watkins's lack of reply to the question whether she had experienced prejudice. On the questionnaire, Watkins did not mark either "Yes" or "No" in response to the question, "Would you say you were raised in an atmosphere free of prejudice?" Instead, she commented, "There are many forms of prejudice, so I can't accurately answer that." With respect to both of these alleged statements by Watkins, as in *Miller-El II*, "[p]erhaps [the prosecutor] misunderstood, but unless he had an ulterior reason for keeping [the struck venireperson] off the jury we think he would have proceeded differently." 545 U.S. at 244. Similarly, "we expect the prosecutor would have cleared up any misunderstanding by asking further questions before getting to the point of exercising a strike." *Id.* "The failure to ask undermines the persuasiveness of the claimed concern." *Id.* at 250 n.8. As the voir dire transcript shows, Watkins testified that she had no reservations about her brother's conviction influencing her in the trial, and the prosecutor never challenged her on that assertion.

Moreover, the prosecutor's explanation is undermined by his treatment of three non-African-American jurors, two of whom also had relatives who had been charged with homicides, and one of whom was unsure of a family member's past problems with the law. Juror 1's cousin shot and killed his brother-in-law and Juror 14's father was arrested for murder, but the prosecutor allowed both to be seated. Additionally, the prosecutor also did not strike Juror 5, who only vaguely related information about his brother's arrest or charge regarding "[s]omething about cocaine" around 1977, about which he "[n]ever did find out the details."

Although no seated juror was precisely identical to Watkins in every respect, the law does not require such a finding. *Miller-El II*, 545 U.S. at 247 n.6 ("A *per se* rule that a defendant cannot win a *Batson* claim unless there is an exactly

identical white juror would leave *Batson* inoperable.”); *see also Kesser*, 465 F.3d at 366. The prosecutor’s unquestioning acceptance of similar non-African-American jurors, and rejection of Watkins based on his concern about the conviction of her brother creating bias against the criminal system, smacks of pretext. The Supreme Court has found that a prosecutor’s reliance on crime in an African-American juror’s family to justify a strike where the relative’s “criminal history was comparable to those of relatives of other panel members not struck by prosecutors” suggests pretext. *Miller-El II*, 545 U.S. at 250 n.8.

Second, the prosecutor’s assertion that he excused Watkins because “she might not believe our officers here, or that they start off not with equal standing as some of the other witnesses, including defendants’ witnesses, we suspect, in this case,” is unpersuasive in light of comparative juror analysis.

Although the prosecutor claims he struck Watkins because she stated she did not think “police officers are always truthful, but [did not] think the civilian would be either,” he failed to strike several non-African-American seated jurors who expressed equal or greater skepticism about police officers’ credibility.[8] The “distrust of law enforcement” rationale for the strike is “severely undercut by the prosecution’s failure to object to other panel members who expressed views much like [the dismissed venireperson].” *Miller-El II*, 545 U.S. at 248.

Furthermore, contrary to the prosecutor’s contention that Watkins might be more likely to credit testimony by defense

---

[8]Juror 1 (on his questionnaire): “[p]olice officers are human and can make mistakes like anyone.” Juror 5: “[t]ruthfulness is a personal issue with very little relevance to profession.” Juror 6: “[e]ither party would have to be proven not credible or dishonest.” Juror 10: police officers “are humans w/ feelings, & their own agendas.” Juror 14: a police officer “is just as human as a civilian and is capable of lieing [sic] just as easy.”

witnesses, her statement clearly indicates *equal* skepticism of civilian witnesses: "I don't [think] police officers are always truthful, but I don't think the civilian would be either." There is simply no evidence in the record to support the prosecutor's suspicions of bias. As the magistrate correctly noted, "because Watkins thought both law enforcement and non-law enforcement could be untruthful, the [prosecutor's assertion that] she therefore disfavored law enforcement is a non-sequitur and strained."

Third, the prosecutor's alleged concern that Watkins might have had a "hidden agenda" to act against the prosecution through a nullification vote is equally implausible. On her questionnaire, Watkins indicated that she saw problems with the criminal justice system, but did not identify any specifics, stating "I'm not sure." A comparison of Watkins to two empaneled non-African-American jurors, who the prosecutor failed to strike, is instructive. Juror 6 stated she was "Not sure" about what the problems were with the criminal justice system. Juror 5 indicated there were problems with the criminal justice system, generally stating that "Nothing is perfect," but did not elaborate. The prosecutor's failure to strike either non-African-American juror also suggests that the "hidden agenda" rationale was pretextual.

The prosecutor also failed to ask Watkins any clarifying questions on voir dire that might confirm or refute his inference. *See Miller-El II*, 545 U.S. at 244. During the *Batson* hearing, he stated that Watkins's answer that she was "not sure" about problems with the criminal justice system "[left] a void somewhere. Not sure in what sense? Not sure because of the O.J. Simpson case? What sense?" However, Watkins's questionnaire bears no indication that she closely followed the Simpson trial; she stated she watched "[j]ust enough to see how it was going" and that "it did not affect [her] view [of the courts and the criminal justice system] at all." Contrary to the requirements of *Batson*, the prosecutor's justification provided no "clear and reasonably specific explanation of [the]

legitimate reasons for exercising the challenges." *Batson*, 476 U.S. at 98 n.20 (internal quotation marks omitted).

Moreover, the prosecutor allowed several jurors to be seated who expressed an interest in the O.J. Simpson case to a far greater degree than Watkins. Juror 1 stated he "watched whenever [he] could on Court T.V." Juror 3 stated he followed the Simpson case "fairly closely" and found the trial "disappointing." Indeed, most of the seated jurors followed news of the Simpson case to some degree,[9] and none stated in their questionnaire that they did not follow it at all. The prosecutor's claimed concern with Watkins's interest in the Simpson trial is simply not credible.

Fourth, the prosecutor's proffered justification that he struck Watkins because "she would not like to sit as a juror" and "indicate[d] she would not be able to give her full attention to the trial because of work pressures" is again undermined by comparative juror analysis. In response to the questionnaire's inquiry of whether there would be "any adverse effects from your service on this jury, such as loss of money, work pressures, or health that might prevent you from giving your full attention to this trial," Watkins marked "Yes" and wrote "Work pressures." Although the prosecutor claimed that this statement contributed to his decision to strike Watkins, he failed to strike seated Jurors 3, 6, 10, and 12, who responded to the question in stronger or more concrete terms. Juror 3 stated that he would "prefer not to be a juror"; Juror 6 expressed her desire not to serve, stating "loss of wage" and "the length of time" as potential problems; Juror 10 noted "[t]ime w/o pay" as an adverse effect of serving on the jury; and Juror 12 indicated that it was not convenient because of the "long drive and . . . traffic." The prosecutor's differential

---

[9]Juror 13 "saw what was on news on television and [she] listened for the verdict." Jurors 4, 8, and 15 "occasionally" followed the trial. Juror 7 followed it "every now and then." Juror 11 followed it for "maybe 2 or 3 weeks."

treatment of these non-African-American jurors again suggests pretext. *See Snyder*, 128 S. Ct. at 1211 (finding it particularly problematic that the prosecutor "attempted to elicit assurances that [the non-African-American juror] would be able to serve despite his work and family obligations," while choosing not to question the African-American juror more deeply about the matter).

Fifth, the prosecutor stated that, although not controlling, he was also concerned with Watkins's employment as an account clerk at a law firm: "We find people that work in the legal field somewhat have a difficult time with issues. I'm not sure what comments she may have expressed about lawyers in that firm." This rationale falls short of *Batson*'s mandate for a "clear and reasonably specific explanation of [the] legitimate reasons for exercising the challenges." *Batson*, 476 U.S. at 98 n.20 (internal quotation marks omitted). The prosecutor also failed to explore Watkins's opinion of attorneys.

Sixth, one of the issues with which the prosecutor specifically noted a concern was Watkins's initial uncertainty in her questionnaire responses about the deliberative process. The prosecutor stated, "I can't take a chance with a juror . . . who will not change her vote, is inflexible even if the others, even if she is persuaded [by the other jurors]. This is not someone that either party would want as a juror." Contrary to this characterization, Watkins initially appeared to suggest a great degree of flexibility, prompting the court to clarify whether she would too easily relinquish her views in the interests of unanimity.

A comparative analysis of Watkins with Jurors 6 and 7 again reveals that the prosecutor allowed several jurors to sit with questionnaire responses more troubling than Watkins's. When asked if she would change her vote after discussion if she still thought she was right, Juror 6 handwrote "Unsure" on her questionnaire. Juror 7 stated that he would not change his

initial view, even if he was persuaded that he was wrong.[10] The prosecutor struck neither, undermining his alleged concern with Watkins's inflexibility as a juror.

Finally, on her questionnaire, Watkins stated that neither she nor anyone close to her used illegal drugs, but commented that she has "friends that use [them]." The prosecutor claimed that this answer supported his strike:

> One can draw an inference from that, that she condones the use of marijuana, thus, that would be violating the law.
>
> She may find certain laws of such a nature that she personally feels she can disregard them, or is morally disinclined to follow them. She may reach such a conclusion during the consideration of this trial. She may not like a particular law, may not feel she has a requirement to follow it.
>
> I'm not saying that's what her position is. One could draw that inference from this response.
>
> It's another issue that leaves me uncomfortable that would support a challenge for cause.

Although the prosecutor cited Watkins's condoning of drugs as a basis for his strike, he offered no explanation for why Watkins's personal views on marijuana would bear on the case. *See Batson*, 476 U.S. at 98 n.20. He also declined to strike six non-African-American jurors who had close friends or relatives who used drugs in the past, four of whom described the relatives' drug use as problematic. Additionally, the prosecutor allowed two jurors to sit who admitted to using

---

[10]Juror 7 marked "No" in response to the question, "If after discussion with your fellow jurors you became persuaded that your initial view had been wrong, would you change your vote?"

drugs *themselves* when they were younger,[11] behavior that is certainly more indicative of a "disregard" for the law than Watkins's association with individuals who use drugs.

The majority explains the prosecutor's justification, which it concedes is "weak," as a distinction between present and past attitudes regarding drug use. In the prosecutor's words, however, the issue of drug use was relevant due to his concern that a juror might reach a conclusion because "*she personally* feels *she* can disregard" particular laws or be "morally disinclined to follow them." This concern applies more, or certainly just as much, to individuals who have themselves used drugs, even if in the past, than with those potential jurors who have made the decision to personally abstain from drug use but happen to know other people who have not. Comparative juror analysis thus leads to only one reasonable conclusion: the prosecutor's asserted concern about condoning drug use was not his actual reason for striking Watkins.

The analysis of the "totality of relevant facts," including comparative juror analysis, refutes the prosecutor's proffered reasons for striking Watkins. "The fact that [a given] reason also applied to these other panel members, most of them white, none of them struck, is evidence of pretext." *Miller-El II*, 545 U.S. at 248. The evidence on the record "is open to judgment calls, but when this evidence on the issues raised is viewed cumulatively its direction is too powerful to conclude anything but discrimination." *Id.* at 265. It leads me to conclude that the prosecutor's actual and only reason for striking Watkins was her race. *See Kesser*, 465 F.3d at 360. Moreover, "the California courts, by failing to consider comparative evidence in the record before it that undeniably contradicted the prosecutor's purported motivations, unreasonably accepted his nonracial motives as genuine." *Id.* at 358. In so doing, the California appellate court reached a conclusion regarding the

---

[11]Juror 5: "Many, many years ago I tried marijuana a few times." Juror 7: "I have [used illegal drugs] in high school 16 years ago."

prosecutor's intent that was not only incorrect, but unreasonable. *See Miller-El II*, 545 U.S. at 266.

## Other Challenged Venirepersons

Because a single racial peremptory challenge calls for a retrial, we need not determine whether there was any genuine non-racial reason for striking each of the other potential African-American jurors. *See Snyder*, 128 S. Ct at 1208; *see also United States v. Clemons*, 843 F.2d 741, 747 (3d Cir. 1988) ("Striking a single black juror could constitute a prima facie case even when blacks ultimately sit on the panel and even when valid reasons exist for striking other blacks."); *United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994) ("[T]he Constitution forbids striking even a single prospective juror for a discriminatory purpose."). Although the strikes exercised against African-American venirepersons Isaac Tillman ("Tillman"), Norman Reynolds ("Reynolds"), James Singleton ("Singleton"), Ruby Parker ("Parker"), Chandra Livingston-Blanks ("Livingston-Blanks"), and Barbara Maxey ("Maxey") are not as clear cut as that of Watkins, an examination of the explanations for these strikes further undermines the prosecutor's credibility and lends additional support to the conclusion that the strike of Watkins was racially motivated. *See Ali*, 584 F.3d at 1193; *Vasquez-Lopez*, 22 F.3d at 902 (The prosecutor's "willingness to make up nonracial reasons . . . make[s] it even harder to believe his reasons for striking [the minority juror in question] were race-neutral.").

First, the prosecutor's professed concern with a venireperson's disregard for the law as measured by their alleged "condoning" of marijuana use appeared to wax or wane depending on whether the venireperson under consideration was African-American. The prosecutor characterized Livingston-Blanks and Maxey, both African-American, as "condoning" the use of the illegal substances during the *Batson/Wheeler* hearing and argued on that basis that he believed they possessed a

more general "disregard for the law." However, the prosecutor expressed no such concerns about the non-African-American jurors with similar or stronger ties to drug use and allowed them to be seated.

The prosecutor expressed concern with Maxey's ex-husband's marijuana use and Livingston-Blanks's admission that "casual friends at social functions" used illegal drugs, and her ex-boyfriend "was a drug and alcohol abuser." The prosecutor claimed that these associations clearly reflected "a mental state that is very suspect to us as a juror," and indicated "some social acceptance of this type of activity" that could lead to an unwillingness to follow the law as jurors, or "some negative feelings towards the government because of the fact that it's illegal to use that product." This professed concern with drug use by friends of potential jurors is undermined by his willingness to seat six jurors who had close friends or relatives who used drugs in the past. Moreover, two jurors were allowed to sit who admitted to using drugs *themselves* when they were younger.[12] The prosecutor's failure to strike these non African-American jurors—or to even inquire at voir dire as to their willingness to follow the law—strongly suggests that these concerns were merely pretextual and makes drug use a dubious basis for the prosecutor's strikes against Livingston-Blanks and Maxey.

Second, the prosecutor's supposed concern with venireperson Watkins's reluctance to serve, *see supra* p. 14706-07, was duplicated with respect to two other African-American venirepersons—Singleton and Maxey—but again failed to manifest itself with respect to non-African-American members of the venire. Venireperson Maxey, a 41-year-old, college-educated, married African-American woman who was employed as an Associate Personnel Analyst, made a hardship request because she was due to transfer to another state agency and was unsure if she would be able to complete her

---

[12]*See supra* note 11.

work if asked to serve on the jury. The court denied her request after questioning, and the record does not reflect that Maxey protested the denial. Venireperson Singleton, an African-American college graduate and U.S. Air Force veteran, did express concern about his high blood pressure and medication, which might require frequent bathroom visits; however, the court made arrangements to ensure Singleton could sit on the jury, allowing him a corner seat and the opportunity to take breaks when needed.

The prosecutor claimed to take all hardship requests "seriously in terms of looking at whether a juror wants to sit, or not, whether or not a juror is going to give us their attention," and to factor in the requests when "considering whether or not to peremptorily challenge a juror." This was based on a belief that a juror with a hardship request "would not make a good juror for [the prosecution and] might be inclined to hurry through the process." However, hardship requests were only used as justification for the prosecutor's decision to strike African-American venirepersons; similar hardship requests did not prompt him to strike Jurors 3, 6, 10, and 12.

The prosecutor's alleged concern about unwillingness to serve is further discredited by his strike of venireperson Reynolds for being "too overly eager to serve." In justifying this strike, the prosecutor focused on a racial aspect of Reynolds's comments about jury duty:

> He appeared to be focused on a race issue by making a comment in reference to a statement he made in the questionnaire that, you know, black people have died for this opportunity, for me to sit there [in the jury].

> That concerned me. I have never heard anybody quite put it that way before, in terms of wanting to be a juror, and it concerned me that he may be overly focused on the issue of race.

> That immediately raised my senses that he might be sympathetic to and relate to two of the defendants that are African-American here.

The prosecutor inferred from Reynolds's statement that Reynolds would be sympathetic to African-American defendants because they were of the same race. There is simply no basis for an inference that African-Americans who appreciate the progress in civil rights of the past century are, on that basis, unable to participate in trials involving other African-Americans. This rationale is so broad that it could exclude nearly all African-Americans from the jury and cannot form a legitimate basis for a peremptory strike. *See Johnson v. California*, 545 U.S. 162, 168 (2005).

The prosecutor's strike for both alleged reluctance and overeagerness to serve on the jury, and his failure to strike similar non-African-American venirepersons, cast doubt on the legitimacy of this proffered reason for striking venirepersons Maxey, Singleton, and Reynolds. A prosecutor truly concerned that Maxey and Singleton would "be inclined to hurry through the process" would also have struck other potential jurors who expressed similar concerns. A prosecutor unmotivated by race would not have considered Reynolds's positive attitude about serving on a jury a troubling factor weighing in favor of a strike. The inconsistent application of the proffered rationale and the lax treatment of seated jurors on the issue, as with the others discussed above, reinforces the impression that race was a substantial or motivating factor in jury selection. *See Miller El II*, 545 U.S. at 252 ("The whole of the voir dire testimony subject to consideration casts the prosecution's reasons for striking [the struck venireperson] in an implausible light. Comparing his strike with the treatment of panel members who expressed similar views supports a conclusion that race was significant in determining who was challenged and who was not.").

Third, as the district court found in the case of Watkins, "the prosecutor's inferential presumption that . . . [African-

American venirepersons] would be race conscious in [their] deliberations if chosen to be a juror" is highly problematic and suggests that the "prosecutor exercised challenges in part with a discriminatory mindset." The prosecutor struck Livingston-Blanks, a 36-year-old, divorced African-American woman, because her employment in "human services" might indicate "a liberal viewpoint, or [that she would be] more inclined to be sympathetic, especially given the age of these defendants." He based this on her temporary employment in clerical roles with the Sacramento County Department of Human Services and Child Protective Services. However, the prosecutor did not strike Juror 15, a registered clinical social worker and nurse.

If Livingston-Blanks's clerical position truly indicated a "liberal" viewpoint sufficient to support a strike, Juror 15's direct experience as a social worker should also have supported a strike. The prosecutor's failure to treat Juror 15 similarly substantially undermines his proffered reason and raises serious doubts about the legitimacy of his strike. "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination." *Miller-El II*, 545 U.S. at 241; *see also McClain v. Prunty*, 217 F.3d 1209, 1220 (9th Cir. 2000) (noting that the "prosecutor's motives may be revealed as pretextual where a given explanation is equally applicable to a juror of a different race who was not stricken by the exercise of a peremptory challenge").

Overall, the validity of the prosecutor's decision to strike Tillman, Reynolds, Singleton, Parker, Livingston-Blanks, and Maxey is a close question. However, in light of the strike of Watkins, the prosecutor's proffer of these questionable explanations for the strikes of the African-American venirepersons, as in *Ali*, "take on a significance that they otherwise might lack." 584 F.3d at 1195; *see also Lewis*, 321 F.3d at 831 ("The proffer of various faulty reasons and only one or two

otherwise adequate reasons, may undermine the prosecutor's credibility to such an extent that the court should sustain a *Batson* challenge."). At a minimum, these dubious explanations reaffirm our conclusion that impermissible biases were a "substantial or motivating factor" in the peremptory challenges and, therefore, the *Batson* motion should have been granted. *See Snyder*, 128 S. Ct. at 1212. Even if considered under AEDPA's deferential standard, the California courts erred by failing to consider comparative evidence in the record that contradicted the prosecutor's purported motivations, leading them to render "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

The district court believed that the *Batson* issue turned on whether a "substantial or motivating factor" test or a "but for" causation requirement is applied. Although the district court found the prosecutor's "discriminatory reason tainted the peremptory strike" of venireperson Watkins and would therefore satisfy the "substantial or motivating factor" test, it nevertheless denied petitioner's habeas petition, feeling bound to apply the "but for" causation requirement as well. *Cook*, No. CIV S-02-2240 LKK GGH P, 2008 WL 1701690, at *1.[13] What we should be doing here is remanding to the district court to apply the proper standard. Instead, the majority substitutes its own judgment for that of the district court.

## CONCLUSION

Following Supreme Court and Ninth Circuit precedent, the proper inquiry in *Batson* cases is whether the race of at least one potential juror was a "substantial or motivating factor" contributing to a prosecutor's exercise of peremptory challenges. *Id.*; *Miller-El I*, 537 U.S. at 346; *Kesser*, 465 F.3d at

---

[13]Had the district court not stated its view that relief would have been granted if a less stringent standard applied, I would have remanded for the application of the "substantial or motivating factor" test.

360. Applying that standard, I would reverse the denial of habeas relief.