**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

ROBERT MCDANIELS,
*Petitioner-Appellant*,

v.

RICHARD J. KIRKLAND, Warden,
*Respondent-Appellee*.

No. 09-17339

D.C. No.
4:05-cv-00904-PJH

---

KEELON T. JENKINS,
*Petitioner-Appellant*,

v.

MICHAEL S. EVANS, Warden,
*Respondent-Appellee*.

No. 11-15030

D.C. No.
3:05-cv-02003-MHP

OPINION

On Remand from the En Banc Court

Filed October 14, 2016

Before: J. Clifford Wallace, Jerome Farris,
and Jay S. Bybee, Circuit Judges.

Opinion by Judge Wallace

**SUMMARY**[*]

**Habeas Corpus**

On remand from the en banc court, the panel affirmed the district court's decisions denying habeas relief to two California state prisoners who contended that the California Court of Appeal's adjudication of their *Batson* claims was based on an unreasonable determination of the facts.

The en banc court held that federal courts sitting in habeas may consider the entire state-court record, not merely those materials that were presented to state appellate courts. After considering juror questionnaires and the transcript of the first day of voir dire which the petitioners failed to provide to the California Court of Appeal, the panel held that the California Court of Appeal's adjudication of their *Batson* claims did not rest on an unreasonable determination of the facts.

The panel addressed an ineffective-assistance-of-counsel claim in a concurrently-filed memorandum disposition.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Jovita P. Tamor and Richard A. Tamor, Tamor & Tamor, Oakland, Californa, for Petitioner-Appellant Robert McDaniels.

Albert Joel Kutchins (argued), Berkeley, California, for Petitioner-Appellant Keelon T. Jenkins.

Arthur P. Beever (argued), Deputy Attorney General; Peggy S. Ruffra, Supervising Deputy Attorney General; Gerald A. Engler, Senior Assistant Attorney General; Kamala D. Harris, Attorney General of California; Office of the Attorney General, San Francisco, California; for Respondents-Appellees.

**OPINION**

WALLACE, Senior Circuit Judge:

Before us on remand from the en banc court are Petitioners' contentions that the California Court of Appeal's adjudication of their *Batson* claims was based on an unreasonable determination of the facts. *McDaniels v. Kirkland*, 813 F.3d 770, 782 (9th Cir. 2015) (en banc).[1] The en banc court clarified that in assessing Petitioners' claims, we are to "consider the entire state-court record, not merely those materials that were presented to state appellate courts."

---

[1] In addition to Petitioners' *Batson* claims, the en banc court remanded for our consideration of one of Jenkins's ineffective assistance of counsel claims. We address that claim in a separate disposition that will be concurrently filed with this opinion.

*Id.* at 780. After considering the entire state-court record, we conclude that the California Court of Appeal's decision did not rest on an unreasonable determination of the facts. We therefore affirm the district court's decisions denying Petitioners habeas relief.

I.

Our prior panel opinion recounted the background necessary to understand this appeal. *McDaniels v. Kirkland*, 760 F.3d 933, 937 (9th Cir. 2014), *on rehearing en banc McDaniels v. Kirkland*, 813 F.3d 770, 782 (9th Cir. 2015) (en banc). The following summary is taken from that opinion:

> The state trial judge limited voir dire to thirty minutes total. He explained that this was because jurors filled out questionnaires, the purpose of which was to do away with the need for extensive voir dire.
>
> During the voir dire, the prosecutor challenged seven out of ten African-Americans called as potential jurors. Petitioners argued that the prosecutor excluded four of those jurors based on their race. During the *Batson* hearing in the state court, the trial judge held that Petitioners had established a prima facie case of discrimination and asked the prosecutor to offer race-neutral reasons for the challenges. The prosecutor gave his reasons, and the trial court concluded that there "didn't appear . . . to be any type of racism going on."

Petitioners appealed to the California Court of Appeal (CCA), arguing that the record did not support the prosecutor's reasons. Petitioners also contended that, but for a few exceptions, only African-American jurors were asked whether they were sympathetic to the defendants, although the CCA stated that six non-African-American jurors were also asked that question.

The trial court held that it was not required to engage in comparative juror analysis because, under then-controlling California law, appellate courts were not to perform comparative juror analysis when the argument was not raised in the trial court. The first day of the voir dire transcript, as well as the questionnaires for stricken jurors, were not included in the CCA record. Citing the significant deference it owed to the trial court where that court had undertaken a sincere effort to evaluate the prosecutor's reasons, the CCA affirmed.

The California Supreme Court affirmed without discussion. Petitioners then separately petitioned the district court. In both proceedings, the state filed the first day of the voir dire transcript as an exhibit. The state also produced the questionnaires of the seated jurors and alternates. The remaining questionnaires had been destroyed.

District Judge Phyllis J. Hamilton heard McDaniels's petition. She held that the state court's finding that the prosecutor did not have discriminatory intent was not unreasonable. She further held that, although the CCA was incorrect that it was not required to perform comparative juror analysis because the state trial court had not done so, comparative juror analysis did not uncover any discriminatory intent because, as the CCA observed, six non African-American jurors were also asked whether they were sympathetic to Petitioners.

District Judge Marilyn H. Patel heard Jenkins's petition, and also held that the CCA's conclusion was not based on an unreasonable interpretation of the facts.

*McDaniels*, 760 F.3d at 937.

## II.

The documents that Petitioners failed to provide to the California Court of Appeal (CCA)—the juror questionnaires and the transcript of the first day of voir dire—are especially important at this juncture. In our earlier panel opinion, we declined to consider those documents because it is undisputed that they were not before the CCA. *Id.* at 942. Given that we are reviewing the CCA's decision and that it had no opportunity to review those documents, it seemed clear to us that a court reviewing on habeas should not evaluate the CCA's decision in light of the missing documents. The en banc court ruled differently, however. It held that "[f]ederal

courts sitting in habeas may consider the entire state-court record, not merely those materials that were presented to state appellate courts." *McDaniels*, 813 F.3d at 780. Given this novel holding, we must now decide whether the CCA made an unreasonable determination of the facts using documents that the parties failed to put before it.

## III.

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the Supreme Court "held that the Equal Protection Clause of the Fourteenth Amendment prohibits prosecutors from exercising peremptory challenges on the basis of race." *Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015). Since *Batson*, the Supreme Court has explained that trial courts should employ a three-step process in adjudicating *Batson* claims:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Snyder v. Louisiana*, 552 U.S. 472, 476–77 (2008) (internal quotation marks and citation omitted). Persuading an appellate court to overturn a trial court's *Batson* decision on a direct appeal is a difficult task, since the applicable standard of review is clear error. *Davis*, 135 S. Ct. at 2199. But the standard becomes even more imposing on habeas review. Under 28 U.S.C. § 2254(d)(2), we have authority to order

habeas relief only where a state court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Moreover, we must presume that a state court's factual findings are correct and "the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" *Davis*, 135 S. Ct. at 2199–2200 (quoting *Rice v. Collins*, 546 U.S. 333, 338–39 (2006)).

Appellate courts are sensibly hesitant to reverse a trial court's *Batson* finding because "[a] trial court is best situated to evaluate both the words and the demeanor of jurors who are peremptorily challenged, as well as the credibility of the prosecutor who exercised those strikes." *Id.* at 2201. Because we, as appellate court judges, have only a cold record before us, we should be exceedingly careful in second guessing a trial court's *Batson* decision.

In their supplemental brief following the en banc court's decision in this matter, Petitioners specify four African-American jurors that they contend the prosecution challenged in violation of *Batson*. We address each juror in turn.

A.

Petitioners first challenge the prosecution's exercise of a peremptory challenge to juror Hilton, which they characterize as "the most egregiously discriminatory strike." The prosecutor gave several reasons for challenging Hilton. First, the prosecutor explained that Hilton "seemed somewhat sympathetic, because of the situation with his son, towards the two defendants." Petitioners argue that Hilton's son was actually the victim of crime, not the perpetrator, and they

therefore assert that the prosecutor's asserted reason was pretextual because the "situation" would have made Hilton sympathetic to the prosecution, not the defense. This argument is pure conjecture, however, since the record does not clearly establish whether Hilton's son was the victim or the perpetrator. Petitioners' assumptions derive from a colloquy between the trial court judge and juror Hilton occurring during voir dire:

> Q: Now, the incident involving your son in New York City, did they catch the person who did that?
>
> A: Yes.
>
> Q: And did you actually sit through the trial?
>
> A: No. That was in New York. I was out here.
>
> Q: Okay. Would there be anything about that situation that would cause you to be unfair or partial to either side in this case?
>
> A: No.

From that colloquy, it is not clear whether Hilton's son was indeed a victim of crime, as Petitioners suggest. While that might be a reasonable inference, there are other inferences one could draw from the colloquy. For instance, it could be that Hilton's son was wrongly accused of a crime (which might have led the prosecutor to conclude reasonably that Hilton would be biased against the prosecution in this case). Further, while the trial judge's phrasing suggests that

Hilton's son was not the perpetrator, it does not completely foreclose that possibility. To that point, Petitioners argue that even if Hilton's son was the perpetrator, the prosecutor's reason for striking Hilton was still pretextual because several empaneled jurors had family members who committed crimes. But, again, the record provides no details with which we might conduct a comparative juror analysis on this point. For instance, assuming Hilton's son committed a crime, the record provides no details about the nature of the crime or its severity. Thus, while the son's crime (if in fact he was the perpetrator, which we cannot be sure of) might have been similar to the crimes committed by the empaneled jurors' associates, it might also have been entirely different. Thus, conducting a comparative juror analysis would be futile since there is nothing for us to compare. In short, the record is sufficiently unclear on the details of the apparent incident involving Hilton's son that we cannot hold it renders the CCA's decision unreasonable.

Another reason the prosecutor gave for challenging Hilton was that when he questioned Hilton about aider and abetter liability, he perceived that Hilton "projected towards me a hypothetical in sort of an aggressive fashion and then I answered it, but it was clear he was questioning the motives that I had as far as bringing the prosecution." Petitioners assert that this reason was pretextual because, in their view, Hilton gave a "fair and intelligent response" to a confusing question posed by the prosecutor. But even if we agreed with Petitioners that Hilton's response was "fair and intelligent," that would do nothing to show that the prosecutor's perception that Hilton answered in an "aggressive" manner was racially motivated. After all, peremptory challenges "are often based on subtle impressions and intangible factors," *Davis*, 135 S. Ct. at 2208, and nothing in the record

establishes that the prosecutor's reason was anything other than that.

One final reason the prosecutor offered for striking Hilton related to Hilton's juror questionnaire: "I'm reviewing his questionnaire, and the weird thing about it is even on his questionnaire when you asked him what race he was, he puts a question mark." Petitioners argue that when one compares Hilton's questionnaire to other juror questionnaires, it becomes obvious that the prosecutor was motivated by race in striking Hilton. They point to three other juror questionnaires, in which two non-African American jurors left the race question blank and another wrote something unintelligible in that space.

We have found comparative juror analysis to be a useful tool in ferreting out racial discrimination. For instance, in *Green v. LaMarque*, a prosecutor asserted he challenged a prospective African-American juror for failing to complete her juror questionnaire. 532 F.3d 1028, 1033 (9th Cir. 2008). But we held that the prosecutor's asserted reason was pretextual because the prosecutor failed to strike several white jurors who similarly failed to complete their questionnaires. *Id.*

While comparative juror analysis is in some cases helpful in discovering discrimination, here the proposed comparison is inapt because writing a question mark in response to a question is markedly different from simply not answering the question or having poor handwriting. As we previously stated, "the prosecutor's statement can reasonably be construed as a general distrust of Hilton based on his refusal to answer questions." *McDaniels*, 760 F.3d at 946. By contrast, leaving the question blank might not trigger that

same distrust. In that situation, the prosecutor could reasonably think that the juror mistakenly overlooked the question, which cannot be said for someone who affirmatively takes issue with the question by writing a question mark. Similarly, an illegible answer hardly conveys to the prosecutor that the juror takes issue with the question, but at most suggests carelessness.

Petitioners take their argument a step further by arguing that the prosecutor's failure to ask any of the four jurors about their answers on the race question suggests that he was not really concerned about the answers and was instead fixated on race. But, again, affirmatively taking issue with a question (by, for instance, placing a question mark next to a question) is qualitatively different from merely not answering the question (either by writing nothing in the space or writing illegibly). Thus, while Petitioners subjectively view the four responses as having the same nature, a reasonable prosecutor might find no correlation between them and, thus, would never have thought to question each juror about their response to the race question.

Petitioners have not "proven purposeful discrimination" as to juror Hilton; therefore they have not established that the CCA's decision resulted in an unreasonable determination of the facts. *Shirley v. Yates*, 807 F.3d 1090, 1107 (9th Cir. 2015) (quoting *Paulino v. Harrison*, 542 F.3d 692, 699 (9th Cir. 2008)).

B.

The next prospective juror we consider is juror Andrews. As a preliminary matter, the prosecutor observed that "the only way we would even know that she's African-American

is because she put on her questionnaire that she's of Caucasian race, African-American, [and] I think American Indian [*sic*]. But physically to look at her, you would not be able to tell she's any parts African-American." In our prior panel opinion we explained that this statement was ultimately an "unpersuasive attempt to dispel the inference of racial motivation." *McDaniels*, 760 F.3d at 944. Nothing in the additional documents which we have been instructed to consider changes that analysis, so we again conclude that nothing in the prosecutor's statement evinces racial animus.

As for why he struck Andrews from the jury, the prosecutor explained that when Andrews "was in court speaking, she seemed very hesitant, very kind of intimidated, just kind of weird as she responded to all our questions, and it didn't seem as if she fully comprehended the situation as it was going on." Petitioners take issue with the prosecutor's assertion that Andrews did not appear to fully comprehend the situation. They argue that the voir dire transcript demonstrates that she understood the situation just fine. The following is the relevant portion of the transcript where Petitioner McDaniels's attorney is questioning Andrews:

> Q: Ms. Andrews, do you understand that – do you have a problem with – do you understand that these two people are presumed to be innocent?
>
> A: No.
>
> Q: You've heard that before?
>
> A: They're presumed to be innocent.

Q: Presumed to be innocent as they sit here?

A: They're presumed to be innocent until the facts are presented, the evidence that shows that they're guilty.

Q: They're presumed to be innocent until and unless the district attorney can prove guilt beyond a reasonable doubt. You'll be given an instruction that says pretty much that later I guess. Again, do you have a problem with that?

A: (shaking head from side to side.) No.

Q: Also let me remind you I represent Mr. McDaniels right here. I don't represent Mr. Jenkins. So we have two defendants. Each defendant has to be determined separately. Do you understand that?

A: Yes.

Q: Can you do that?

A: Yes.

Q: Are you aware that any defendant in any criminal trial in this country has an absolute constitutional right not to testify, and the jury cannot consider, take that into account, can't consider it, can't use it. Are you aware of that?

A: Yes.

Q: Do you have a problem with that?

A: No.

In reviewing this transcript, the CCA held that "[t]he record supports the prosecutor's justification" because Andrews answered "no" in response to the question of whether she understood that the Petitioners were to be presumed innocent. *People v. Jenkins*, 2003 WL 22881662, at \*4 (Cal. Ct. App. Nov. 25, 2003) (unpublished). Petitioners argue that it was unreasonable for the CCA to reach this conclusion because Petitioner McDaniels's attorney used, as they characterize it, "absurdly confusing syntax." We can see both sides. The CCA was not incorrect in observing that Andrews did answer "no" to the question about the presumption of innocence. But, as Petitioners point out, Petitioner McDaniels's attorney rephrased his question several times, which could have made it difficult to follow.

But in any event, we rejected Petitioners' arguments in our prior panel opinion. There, we concluded that "[t]he transcript itself does not so clearly show that Andrews was not hesitant, intimidated, or inattentive such that we could here hold that the state court was objectively unreasonable in crediting the prosecutor." *McDaniels*, 760 F.3d at 944. Though the en banc court vacated our prior opinion, it did so to allow us to reconsider Petitioners' claims in light of the juror questionnaires and the transcript of the first day of voir dire.

Thus, Petitioners must show that something in the additional documents which we may now consider changes

our earlier analysis, otherwise there is no reason for us reconsider our holding. They have failed to do so. Much of what is in their supplemental brief re-litigates the arguments we earlier rejected. Petitioners' only new argument is that several non-African-American jurors were empaneled even though they were unable to answer relatively straightforward questions. For instance, they cite one juror questionnaire in which the juror answered "No" to the question of whether she had ever been the victim of a crime, but then in the next question indicated that her car and purse were stolen and her house burglarized. If that was all that was on the questionnaire it might indeed appear that the juror was unable to straightforwardly answer whether she had been the victim of a crime. But Petitioners conveniently omit the fact that next to her answer of "No" to the first question, the juror wrote "(not violent)." Thus, when one has the full picture, there is little doubt that the juror understood the first question to be asking whether she herself had been involved in a crime and understood the second question to be asking whether any of her property had been involved in a crime. With that understanding and context, her answers make complete sense.

As a different example, Petitioners cite another juror's questionnaire in which the juror wrote "Nee [*sic*] surgery" in response to the questionnaire's direction that "If you are disabled please state the nature of your disability." But we fail to see how the juror's misspelling and failure to elaborate on his medical condition is on a par with the prosecutor's demeanor-based rationale for striking Andrews. The prosecutor's reason for challenging Andrews did not rest alone on what he perceived to be Andrews's inability to answer the presumption of innocence question, but was grounded additionally on his perception that "she seemed very hesitant, very kind of intimated, just kind of weird as she

responded to all our questions." Those visual cues that the prosecutor perceived are quite different from the misspelling and failure to elaborate that Petitioners point to in the juror questionnaire.

Petitioners have failed to establish that the CCA's decision as to juror Andrews resulted in an unreasonable determination of the facts.

C.

Last, we address Petitioners' contentions regarding jurors Reeves and Woods. Petitioners have not pointed to anything in the juror questionnaires or the transcript of the first day of voir dire that would show racial discrimination. Rather, they contend that their arguments pertaining to juror Hilton shed "new light" on the prosecutor's challenging of Reeves and Woods. But, as we hold above, Petitioners have failed to show that the prosecutor engaged in racial discrimination by challenging Hilton. Therefore, their arguments as to Reeves and Woods must necessarily fail since in reality there is no "new light" under which we should view their arguments. We therefore reaffirm the holdings of our prior panel opinion that Petitioners have not shown that the CCA erred in rejecting their *Batson* claims as to jurors Reeves and Woods. *McDaniels*, 760 F.3d at 946.

IV.

After considering the juror questionnaires and first day of voir dire, as instructed by the en banc court, we hold that the California Court of Appeal's decision did not result in "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 22 U.S.C.

§ 2254(d)(2). We therefore affirm the district court's decisions denying Petitioners habeas relief.

**AFFIRMED.**